## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| PLANNED PARENTHOOD OF THE COLUMBIA/WILLAMETTE INC.; et al., | No. 04-35214 D.C. No. CV-95-01671-REJ |
| Plaintiffs - Appellees, | |
| v. | **JUDGMENT** |
| AMERICAN COALITION OF LIFE ACTIVISTS; et al., | |
| Defendants - Appellants. | |

Appeal from the United States District Court for the District of Oregon (Portland).

This cause came on to be heard on the Transcript of the Record from the United States District Court for the District of Oregon (Portland) and was duly submitted.

On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said District Court in this cause be, and hereby is **AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART AND REMANDED**. Each party shall bear its own costs.

Filed and entered 09/06/05



A TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

MAY 1 2 2006

by:
Deputy Clerk

# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PLANNED PARENTHOOD OF THE
COLUMBIA/WILLAMETTE INC.;
PORTLAND FEMINIST WOMEN'S
HEALTH CENTER; ROBERT CRIST,
M.D.; WARREN M. HERN, M.D.;
ELIZABETH NEWHALL, M.D.; JAMES
NEWHALL, M.D.,
          *Plaintiffs-Appellees,*

v.

AMERICAN COALITION OF LIFE
ACTIVISTS; ADVOCATES FOR LIFE
MINISTRIES; MICHAEL DODDS;
TIMOTHY PAUL DRESTE; JOSEPH L.
FOREMAN; BRUCE EVAN MURCH;
DONALD TRESHMAN; CHARLES
WYSONG; MICHAEL BRAY; ANDREW
BURNETT; DAVID CRANE; CHARLES
ROY MCMILLAN; CATHERINE
RAMEY; DAWN MARIE STOVER,
          *Defendants-Appellants.*

No. 04-35214

D.C. No.
CV-95-01671-REJ

OPINION

Appeal from the United States District Court
for the District of Oregon
Robert E. Jones, District Judge, Presiding

Argued and Submitted
July 12, 2005—Portland, Oregon

Filed September 6, 2005

Before: Ferdinand F. Fernandez, Pamela Ann Rymer, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Ryner

## SUMMARY

### Torts/Damages

The court of appeals affirmed a judgement of the district court in part, reversed in part, vacated in part, and remanded. The court held that in a multi-plaintiff, multi-defendant action, an approach that compares each plaintiff's individual compensatory damages with the punitive damages awards against each defendant more accurately reflects the true relationship between the harm for which a particular defendant is responsible, and the punitive damages assessed against that defendant.

A jury awarded over $108 million in punitive damages against appellants American Coalition of Life Activists and thirteen others (collectively, ACLA) in 1999 for violations of the Freedom of Access to Clinic Entrances Act (FACE) in a suit brought in federal district court in Oregon by appellees including Planned Parenthood of the Columbia/Willamette, Inc. and four physicians who performed abortions alleging that ACLA had engaged in a campaign of terror and intimidation by targeting them with three specific threats, including a "Deadly Dozen GUILTY" poster, a "Crist" poster aimed at a specific physician, and a "Nuremberg Files" compilation about those who the ACLA anticipated one day might be put on trial for crimes against humanity. The posters identifying these physicians were circulated in the wake of a series of "WANTED" and "unWANTED" posters that had identified other doctors who performed abortions and who were murdered after the "WANTED" and "unWANTED" posters were circulated. ACLA appealed the judgment, and the court of appeals affirmed on rehearing en banc in all respects but for punitive damages, holding that ACLA made a "true threat"

(*PPCW V*). The court of appeals remanded for the district court to consider in the first instance whether the award was appropriate.

On remand, the district court ruled that the jury's compensatory awards were joint and several. It determined that ACLA's threats of violence were at the top of the hierarchy of reprehensibility, that a high ratio of punitive damages to compensatory damages was warranted because of particularly egregious conduct that resulted in injury that is difficult to quantify, and that the awards against each defendant were not excessive when compared to the civil penalties available for each violation of FACE. Therefore, it upheld the punitive award in its entirety. The district court denied a new trial and declined to consider additional issues raised by ACLA as beyond the scope of the mandate.

ACLA appealed. ACLA also raised a number of issues that pertained to the liability judgment.

[1] Elementary notions of fairness enshrined dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that may be imposed. Accordingly, the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. Whether an award comports with due process is measured by three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

[2] There was a physical component to ACLA's conduct, in that it was intended to intimidate by causing fear of murder or serious bodily injury on account of the poster pattern, and it actually caused emotional distress. [3] ACLA could reason-

ably foresee that identifying physicians on WANTED-type posters and the Nuremberg Files scorecard would be interpreted as a serious expression of intent to harm. [4] ACLA targeted the physicians' practices and intentionally tried to scare them into quitting. [5] The threats against physicians were true threats because of the pattern of previous violence that followed in the wake of identifying other doctors who performed abortions. [6] It had to be concluded that, on balance, ACLA's conduct was sufficiently reprehensible to warrant the imposition of significant sanctions to punish and deter.

[7] Extreme variation is not so much a reason for rejecting an approach to determine the ratio, as for rejecting awards that are grossly disproportionate. Rather, in a multi-plaintiff, multi-defendant action, an approach that compares each plaintiff's individual compensatory damages with the punitive damages awards against each defendant more accurately reflects the true relationship between the harm for which a particular defendant is responsible, and the punitive damages assessed against that defendant. [8] Accordingly, the court of appeals accepted ratios arrived at by comparing each plaintiff's individual compensatory damages and punitive damages awards as to each defendant.

[9] In cases where there are significant economic damages and punitive damages are warranted but behavior is not particularly egregious, a ratio of up to 4 to 1 serves as a good proxy for the limits of constitutionality. [10] With few exceptions, the ratios in ACLA's case were well in excess of single digits. ACLA's conduct was particularly reprehensible. In these circumstances, a substantial award of punitive damages in relation to the actual harm caused would reasonably serve the interests of punishment and deterrence. The court of appeals' constitutional sensibilities were not offended by a 9 to 1 ratio.

[11] FACE provides for criminal fines and civil penalties in actions brought by the Attorney General. These penalties

indicated that Congress believed that substantial sanctions were appropriate to deter those who interfere with clinic operations. FACE's provision for punitive damages was uncapped, so ACLA would have known that its exposure to penalties in a civil action for violating that Act could be significant.

[12] Considering reprehensibility, which was high; the ratios, which in the main reflected punitive awards that were significantly disproportionate to the amount of actual or likely harm; and comparable sanctions, it had to be concluded that the award of punitive damages could not stand. [13] Accordingly, the court of appeals remitted to a sum for each plaintiff that was nine times that plaintiff's compensatory recovery, and allocated that amount of punitive damages among defendants in the same proportion as the jury did in its verdicts. [14] The case had to be remanded for the district court to order a new trial unless the physicians accepted the remittitur.

[15] On a second appeal, the higher court is confined to a consideration of the proceedings that took place in the trial court after the mandate in the first case was handed down. Matters that were adjudicated on the first appeal are no longer open to re-examination. [16] The court of appeals' mandate in *PPCW V* was clear. ACLA's additional issues were not open for review.

## COUNSEL

Edward L. White III, Thomas More Law Center, Ann Arbor, Michigan, for Bray, Burnett, Crane, McMillan, Ramey, and Stover, defendants-appellants, and Christopher A. Ferrara, American Catholic Lawyers Ass'n., Fairfield, New Jersey, for American Coalition of Life Activists, Advocates for Life Ministries, Dodds, Dreste, Foreman, Murch, Treshman and Wysong, for the defendants-appellants.

Maria T. Vullo, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, for the plaintiffs-appellees.

---

## OPINION

RYMER, Circuit Judge:

American Coalition of Life Activists and thirteen others (collectively, ACLA)[1] appeal the decision of the district court on remand that the $108.5 million in punitive damages awarded by a jury in 1999 for violations of the Freedom of Access to Clinic Entrances Act (FACE), 18 U.S.C. § 248, comports with due process. *Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 300 F. Supp. 2d 1055 (D. Or. 2004) (*PPCW VII*).[2] We disagree, and remit to an amount for each defendant to pay to each plaintiff that does not exceed the constitutional

---

[1] These parties are: Advocates for Life Ministries (ALM), Michael Bray, Andrew Burnett, David A. Crane, Timothy Paul Dreste, Joseph L. Foreman, Roy McMillan, Michael Dodds, Bruce Murch, Catherine Ramey, Dawn Marie Stover, Donald Treshman, and Charles Wysong.

[2] Other reported decisions in this case are: *Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 945 F. Supp. 1355 (D. Or. 1996) (*PPCW I*) (denial of motion to dismiss); *Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 23 F. Supp. 2d 1182 (D. Or. 1998) (*PPCW II*) (ruling on summary judgment); *Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 41 F. Supp. 2d 1130 (D. Or. 1999) (*PPCW III*) (issuing permanent injunction and making factual findings); *Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 244 F.3d 1007 (9th Cir. 2001) (*PPCW IV*) (Ninth Circuit panel opinion); *Planned Parenthood of the Columbia/ Willamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058 (9th Cir. 2002) (en banc) (*PPCW V*) (affirming district court in all respects but remanding for consideration of constitutionality of punitive damages); *American Coalition of Life Activists v. Planned Parenthood of the Columbia/Willamette, Inc.*, 539 U.S. 958 (2003) (*PPCW VI*) (denying certiorari).

limit. ACLA also raises a number of issues that pertain to the liability judgment, which the rule of the mandate precludes us from considering.

I

On October 26, 1995, four individual physicians and two clinics[3] brought an action against ACLA for violating or conspiring to violate FACE[4] and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968. The facts are fully described in the district court's post-trial opinion, *PPCW III*, 41 F. Supp. 2d at 1131-51, and our en banc opinion, *PPCW V*, 290 F.3d at 1063-1066. In sum, physicians alleged that ACLA had engaged in "a campaign of terror and intimidation" by targeting them with three specific threats — the "Deadly Dozen GUILTY" poster, the "Crist" poster, and the "Nuremberg Files." The "Deadly Dozen GUILTY" poster identified Hern and the Newhalls among ten others; the Crist "GUILTY" poster contained Crist's name, addresses, and photograph; and the "Nuremberg Files" was a compilation about those who the ACLA anticipated one day might be put on trial for crimes against humanity. The posters identifying these physicians were circulated in the wake of a series of "WANTED" and "unWANTED" posters that had identified other doctors who performed abortions and who

---

[3] The physicians are Dr. Robert Crist, Dr. Warren M. Hern, Dr. Elizabeth Newhall, and Dr. James Newhall. The two health clinics are Planned Parenthood of the Columbia/Willamette, Inc. (PPCW) and the Portland Feminist Women's Health Center (PFWHC). We refer to them collectively as "physicians" unless context otherwise requires.

[4] FACE gives aggrieved persons a right of action against whoever by "threat of force . . . intentionally . . . intimidates . . . any person because that person is or has been . . . providing reproductive health services." 18 U.S.C. § 248(a)(1), (c)(1)(A). A person aggrieved may obtain compensatory and punitive damages, as well as equitable relief. *Id.* § 248(c)(1)(A)-(B). FACE allows a plaintiff in a civil action to elect "in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation." *Id.* § 248(c)(1)(B).

were murdered after the "WANTED" and "unWANTED" posters were circulated.

The jury found for physicians on all counts except against Bray and Treshman on the RICO claims (ACLA was alleged to be the RICO enterprise and was not a defendant on this claim). It awarded Crist $39,656 in compensatory damages under FACE; Hern, $14,429; E. Newhall, $15,797.98; J. Newhall, $375; PPCW, $405,834.86; and PFWHC, $50,243.30, for a total of $526,336.14. The jury grouped defendants into different tiers for purposes of exemplary damages: ACLA and ALM were each found liable to Crist for $2.25 million; to Hern for $1.5 million; to E. Newhall for $2 million; to J. Newhall for $2 million; to PPCW for $6 million; and to PFWHC for $3 million. Bray, Burnett, Crane, McMillan, Treshman and Wysong were each found liable to Crist for $1 million; to Hern for $1 million; to E. Newhall for $1 million; to J. Newhall for $1 million; to PPCW for $2 million; and to PFWHC for $2 million. Dodds, Dreste, Foreman, and Murch were each found liable to Crist for $750,000; to Hern for $750,000; to E. Newhall for $750,000; to J. Newhall for $750,000; to PPCW for $1 million; and to PFWHC for $1 million. And Ramey and Stover were each found liable to Crist for $500,000; to Hern for $500,000; to E. Newhall for $500,000; to J. Newhall for $500,000; to PPCW for $750,000; and to PFWHC for $750,000. RICO damages were awarded in varying amounts and were trebled pursuant to statute. A chart summarizing the damages award appears in Appendix I. Following trial, the district court made extensive findings and ordered permanent injunctive relief. *PPCW III*, 41 F. Supp.2d at 1131-53, 1155-56.

ACLA appealed the judgment, which this court affirmed on rehearing en banc in all respects but for punitive damages. *PPCW V*, 290 F.3d at 1088. ACLA argued that the punitive damages award amounted to a judgment without notice contrary to *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). As we had recently discussed this issue in depth in *In*

*re Exxon Valdez*, 270 F.3d 1215, 1241 (9th Cir. 2001), we remanded for the district court "to consider in the first instance whether the award is appropriate in light of *Exxon Valdez*." *PPCW V*, 290 F.3d at 1086.

On remand, the district court held that the jury's compensatory awards were joint and several. It determined that ACLA's threats of violence were at the top of the hierarchy of reprehensibility, that a high ratio of punitive damages to compensatory damages was warranted because of particularly egregious conduct that resulted in injury that is difficult to quantify, and that the awards against each defendant were not excessive when compared to the civil penalties available for each violation of FACE. Therefore, it upheld the punitive award in its entirety. The district court denied a new trial and declined to consider additional issues raised by ACLA as beyond the scope of the mandate.

ACLA timely appealed.

II

ACLA argues that "the preposterous $109 million award" must be vacated and the punitive damages claim must be dismissed for failure to comply with any of the guideposts the Supreme Court laid out in *BMW*. Further, it submits that its conduct was a first offense that consisted of nothing more than publishing political communications for which liability was imposed without proof of reprehensibility by way of specific intent to threaten. Even if the verdict is not reversed, ACLA maintains that compensatory damages must be deemed sufficient punishment as the defendants cannot pay even that award and the injunction serves the aim of punishment and deterrence. It also contends that the punitive damages at most should not exceed the comparable civil penalties under FACE.

Physicians support the award by urging that a threats case is the type of case that falls at the top of the hierarchy of rep-

rehensibility. They argue for a ratio analysis that, like the district court's, focuses on defendants' responsibility for damages.

[1] The Supreme Court has considered the constitutional limits of punitive damages three times in the last ten years, first in *BMW v. Gore*, next in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001), then in *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408 (2003). A number of principles emerge. Compensatory damages and punitive damages serve different purposes; compensatory damages redress concrete loss caused by the defendant's wrongful conduct, while punitive damages are aimed at deterrence and retribution. *See State Farm*, 538 U.S. at 416; *Cooper Indus.*, 532 U.S. at 432. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty" that may be imposed. *BMW*, 517 U.S. at 574. Accordingly, "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm*, 538 U.S. at 416. Whether an award comports with due process is measured by three guideposts:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Id.* at 418 (citing *BMW*, 517 U.S. at 575).

We are obliged to review *de novo* the district court's application of the *BMW* guideposts to a jury's punitive damages awards. *State Farm*, 538 U.S. at 418; *Cooper Indus.*, 532 U.S.

at 431. "Exacting appellate review ensures that an award of punitive damages is based upon an " 'application of law, rather than a decisionmaker's caprice.' " *State Farm*, 538 U.S. at 418 (quoting *Cooper Indus.*, 532 U.S. at 436, quoting *BMW*, 517 U.S. at 587 (Breyer, J., concurring)). Of course, we defer to the district court's findings of fact unless they are clearly erroneous. *Cooper Indus.*, 532 U.S. at 440 n.14; *Leatherman Tool Group, Inc. v. Cooper Indus, Inc.*, 285 F.3d 1146, 1150 (9th Cir. 2002).

We start with *BMW* and post-*BMW* authorities to see how the due process analysis has played out in other cases, and to shed light on what might be deemed excessive in this particular case.

In *BMW*, a disgruntled new car owner brought an action against several defendants for their failure to disclose that the automobile he purchased had been repainted after being damaged prior to delivery. The jury awarded Gore $4,000 in compensatory damages and $4,000,000 in punitive damages (later reduced by the Alabama Supreme Court to $2,000,000). Of the three guideposts that it embraced, the United States Supreme Court said that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. at 575. This is because, traditionally, nonviolent conduct has been viewed as less serious than violence or the threat of violence, and trickery or deceit are more reprehensible than negligence. BMW's conduct was not "egregiously improper" and, thus, was not sufficiently reprehensible to warrant a $2 million exemplary damages award because BMW inflicted only economic harm on a victim who was not financially vulnerable, its conduct manifested no indifference to health or safety, and there were no deliberate false statements or acts of affirmative misconduct. *Id.* With respect to the second guidepost (ratio), the Court "rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* dam-

ages to the punitive award," *id.* at 582, and remarked that "[i]n most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis." *Id.* at 583. However, the 500 to 1 ratio between punitive damages and actual harm in that case was "breathtaking." *Id.* Finally, with respect to the third guidepost (sanctions for comparable misconduct), the Court noted that the civil penalty in Alabama for violating its Deceptive Trade Practices Act was $2,000, and in other states, the fine ranged from $5,000 to $10,000. None of these statutes would put BMW on notice that its first violation might be subject to a multimillion dollar penalty.

In *Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001), an African American employee brought a civil rights action against his employer alleging discrimination on the basis of race. Swinton was awarded $35,612 in compensatory damages and $1,000,000 in punitive damages, which we upheld under *BMW*. In assessing the reprehensibility factor, we observed that Swinton was the only African-American employee of about 140 at his plant, he was subject to daily abuse featuring the word "nigger," and he was the target of a constant barrage of racial harassment which his employer knew of and yet did nothing to stop. The ratio of punitive to compensatory damages — 28 to 1 — did not offend our " 'constitutional sensibilities.' " *Id.* at 819 (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18 (1991)). We explained that "[t]his is precisely the type of case posited by the Court in *BMW*—the low award of compensatory damages supports a higher ratio of punitive damages because of 'particularly egregious' acts and 'noneconomic harm that might have been difficult to determine.' " *Id.* at 818 (quoting *BMW*, 517 U.S. at 582). We also took into account the harm likely to result from the employer's conduct, and were impressed by the fact that "the harm from unchecked racial harassment occurring day after day cannot be calculated with any precision . . . ." *Id.* at 819. With respect to the third guidepost, we analogized to the $300,000 damages cap for Title VII violations, as there

were no other comparable civil penalties. This factor, we thought, weighed in favor of a reduction; however, as Congress had not seen fit to impose any recovery caps in cases under 42 U.S.C. § 1981, we upheld the award as constitutional.

*Exxon Valdez* involved the appeal of a $5 billion punitive damages award arising out of an oil spill in Prince William Sound. The jury awarded $287 million in compensatory damages, and the district court determined that the total harm could range from $288.7 million to $418.7 million. However, as Exxon had settled with the government for environmental harm and had instituted a program to repay property owners, the verdict and punitive damages award challenged on appeal were only for damages to economic expectations of commercial fishermen. Applying the *BMW* guideposts, we agreed that Exxon's conduct was reprehensible because it knew of the risk of an oil spill yet left the ship in the hands of an alcoholic who was drinking. While this justified punitive damages, we thought Exxon was less reprehensible than in other punitive damages cases because it did not spill the oil on purpose or kill anyone. We noted that a ratio of 17.42 to 1 (based on the jury's verdict) or 12 to 1 (using the upper limits of the district court's estimate of actual harm) was greatly above the 4 to 1 ratio that the Supreme Court "called 'close to the line' " in *Haslip*. *Exxon Valdez*, 270 F.3d at 1243. With respect to the third guidepost, we acknowledged that Exxon was exposed to a criminal fine of $1.03 billion and to $100 million in civil penalties, and that it had entered into a plea agreement for $150 million which represented an adversarial judgment about the appropriate level of punishment. We further observed that the civil ceiling was only 1/50 of the punitive damages award. Considering all of these factors, we concluded that the $5 billion punitive damages award was too high to withstand the review required under *BMW*.

Following remand from the Supreme Court, in *Leatherman*, 285 F.3d at 1146, we considered *de novo* a punitive damages

award of \$4.5 million where the actual harm was \$50,000. Cooper had used photographs and drawings of Leatherman's products as its own when it first attempted to enter the market in which Leatherman competed. We thought Cooper's conduct was more foolish than reprehensible and thus, the first guidepost did not support the jury's award of punitive damages. As to the second guidepost, the ratio was 90 to 1, only "somewhat less 'breathtaking' " than that invalidated by the Supreme Court in *BMW*. *Id.* at 1150 (quoting *BMW*, 517 U.S. at 583). Cooper caused relatively little actual harm, but Leatherman relied on an estimate of profits Cooper might have realized had there been no injunction and had Cooper been able to sell the product. We thought it unrealistic to assume that all of Cooper's sales of the tool would have been attributable to its misconduct in using the photograph of Leatherman's tool. Finally, Cooper would not have been subject to civil penalties in any amount approaching the award. For these reasons, we reduced the award to \$500,000 (a ratio of 10 to 1).

The Supreme Court again considered the constitutional limits of punitive damages in *State Farm*, 538 U.S. 408. The Campbells brought an action for bad faith failure to settle an underlying suit within policy limits. They were ultimately awarded \$1 million in compensatory damages and \$145 million in punitive damages. Addressing reprehensibility, the Court first summed up *BMW*'s instructions to consider whether:

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient

to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

*Id.* at 419 (citations omitted). Even though State Farm's handling of the underlying claims was reprehensible to some degree, the Court made clear that it could only be punished for conduct directed toward the Campbells — not for its operations elsewhere, or for other parties' hypothetical claims against it, as the Utah court had allowed. The Court again declined to impose a bright-line ratio which an exemplary award cannot exceed, but did state that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425. It pointed out that a 4 to 1 ratio drew upon a long history of sanctions of double, treble or quadruple damages to deter and punish, and that such a ratio might be close to the constitutional line. And the Court restated "what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 or, in this case, of 145 to 1." *Id.* (citations omitted). In its view, 145 to 1 did not comport with due process. Finally, the Court looked to the most relevant civil sanction, a \$10,000 fine for an act of fraud, which was "dwarfed by the \$145 million punitive damages award." *Id.* at 428. Reversing, the Court observed that a punitive award at or near the amount of compensatory damages (\$1 million) might be justified, but that the award of \$145 million was unreasonable and disproportionate to the wrong committed.

*Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003), was decided on appeal after *State Farm*. Zhang

brought suit for employment discrimination and breach of contract, contending that he was retaliated against and ultimately fired due to his Chinese ethnicity. Witnesses testified that Zhang was distrusted because he was Chinese; people made derogatory comments about him; Zhang was generally treated worse than the white employees; and he was sidelined in the management of the company, left out of management teams, was never paid a bonus owed to him, and was eventually terminated. The jury found that the corporate defendants were liable for discrimination under 42 U.S.C. § 1981, awarding Zhang $360,000 in compensatory damages and $2.6 million in punitive damages. Upholding the constitutionality of the punitive damages award, we saw the gulf between the reprehensibility of the conduct in *Zhang,* and in *BMW* and *State Farm,* as substantial, particularly because intentional discrimination is a different kind of harm in that it is an affront to personal liberty. We explained that racial discrimination has often resulted in large punitive damages awards, *see Swinton,* 270 F.3d at 817-18, and we had "no trouble concluding that the corporate defendants' discrimination against Zhang was sufficiently reprehensible to justify a substantial punitive damages award." *Zhang,* 339 F.3d at 1044. Of the 7:1 ratio, we remarked that "[w]e are aware of no Supreme Court or Ninth Circuit case disapproving of a single-digit ratio . . . , and we decline to extend the law in this case." *Id.* As for comparable penalties, we analogized (as in *Swinton*) to the $300,000 cap for Title VII, and were satisfied that the discrepancy was not nearly so great as in *BMW* or *State Farm.* Accordingly, we did not disturb the jury's award.

In *Hangarter v. Provident Life & Accident Insurance Co.,* 373 F.3d 998, 1015 (9th Cir. 2004), another bad faith case, we approved a punitive damages ratio of approximately 2.6:1 as being well within the Supreme Court's suggested range for punitive damages awards.

Finally, we reversed a $5 million punitive damages award in *Bains LLC v. Arco Products Co.,* 405 F.3d 764 (9th Cir.

2005). *Bains* involved a race discrimination claim under § 1981 and a claim for breach of contract. The jury awarded $1 on the 42 U.S.C. § 1981 claim and $50,000 on the contract claim. We held that the jury could consider damages awarded on both claims in determining the correct amount of punitive damages. Applying *State Farm,* we noted that this was not a "small amount" case because the $50,000 in economic damages were substantial. *Bains* read Supreme Court authority as implying in these circumstances a ceiling of at most $450,000 (9 times the compensatory damages), not the 100 times that was awarded. Although discrimination was highly reprehensible, we noted that it was not threatening to life or limb. We declined to uphold a higher figure based on *Swinton,* which came down before *State Farm* and involved a much lower ratio (28, compared with 100, times compensatory damages). With respect to the third factor, *Bains* again analogized to Title VII where comparable penalties would be capped at $300,000. Thus, we arrived at a range of $300,000 to $450,000 as constitutionally acceptable (a ratio of 6:1 to 9:1), and left the exact amount to be fixed by the district court on remand.

Informed by these analyses, we now apply the *BMW* guideposts to this case.

## A

### *Degree of Reprehensibility*

ACLA argues generally that it is being punished by the district court's injunction. It asserts that compensatory damages are punishment enough, and that in any event it cannot afford to pay the compensatory fines, so punitive damages would serve no purpose. It contends that the district court failed to make findings as to the reprehensible conduct of each defendant as it is required to do, *see Bell v. Clackamas County,* 341 F.3d 858, 867-68 (9th Cir. 2003), and that regardless, the record does not support finding that each defendant acted with

specific intent and actual malice because physicians did not have to and did not prove that any or all defendants subjectively intended to threaten them with bodily injury. Finally, ACLA maintains that none of the defendants is a recidivist because the past bad conduct upon which the district court relied is dissimilar from the current conduct being punished.

We dispose at the outset of ACLA's invitation to revisit both the district court's findings, and our conclusions on rehearing en banc, about its subjective intent to harm physicians. Suffice it to say, we held en banc that ACLA made a true threat, *i.e.*, a threat where a reasonable person would foresee that the listener will believe he will be subjected to physical violence, with the intent to intimidate physicians. This is what FACE requires, *PPCW V*, 290 F.3d at 1075-76, and as we shall explain, we cannot revisit our judgment to that effect. *See infra* Part III. Beyond this, the district court made extensive, individualized findings about the conduct of each party in its post-trial order, *PPCW III*, 41 F .Supp. 2d at 1136-53, which it incorporated and elaborated upon in its post-remand order, *PPCW VII*, 300 F. Supp. 2d at 1059-60. Therefore, we turn directly to reprehensibility. In doing so, we will not rehash the facts because much ink has already been spilt describing them in detail. Assuming the facts found by the jury and the district court in physicians' favor (as we must), and applying the reprehensibility factors to them *de novo* (as we also must), we conclude:

[2] *Physical or economic harm.* There was a physical component to ACLA's conduct, in that it was intended to intimidate by causing fear of murder or serious bodily injury on account of the poster pattern, and it actually caused emotional distress. There also was an economic component, in that ACLA's intention was for the same fear to drive physicians away from their practices, and they actually incurred expenses (primarily for security). To the extent the actual harm was economic, this factor weighs somewhat in ACLA's favor, but

as the intimidation relied upon a physical aspect as well, it does not clearly cut either way.

[3] *Indifference to health or safety.* In physicians' view, the conduct to which they were subjected is the worst kind of tortious conduct a defendant can commit. *See BMW*, 517 U.S. at 575-76; *Swinton*, 270 F.3d at 818. This is not quite so, as there was no actual violence. ACLA made true threats intending to intimidate physicians by generating a fear of violence, though not necessarily intending to hurt or kill these particular providers. That said, ACLA could reasonably foresee that identifying physicians on "WANTED"-type posters and the Nuremberg Files scorecard would be interpreted as a serious expression of intent to harm. As ACLA and physicians knew, some of those whose names appeared on previous posters had been killed. Physicians were terrified and took the threat seriously. FBI and other law enforcement officials regarded the posters and files as sufficiently dangerous that they warned physicians to purchase bullet proof vests, obtain protection, and take other protective measures. ACLA acted purposefully to intimidate. While the reprehensibility of its conduct was a notch removed from a direct threat of violence, the effect on physicians was not much different. The effect was not accidental. In these circumstances, ACLA's conduct is significantly blameworthy. It hovers high in the hierarchy.

[4] *Financial vulnerability.* The district court found that physicians were financially vulnerable, presumably because their livelihoods depended upon their practices. ACLA targeted their practices and intentionally tried to scare them into quitting. Crist actually stopped practicing for a while out of fear for his life. As *BMW* indicates, "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." 517 U.S. at 576 (citation omitted).

[5] *Recidivism.* ACLA contends that this is a "first offense" for threats, which is true so far as it goes. Neither ACLA nor

any of its co-defendants had ever been found liable for, or convicted of, violating FACE, but they have histories of unlawful conduct with respect to anti-abortion activities. More importantly, the threats against physicians were true threats because·of the pattern of previous violence that followed in the wake of identifying other doctors who performed abortions on "WANTED"-type posters and the Nuremberg Files. Indeed, ACLA was formed because ALM, Bray, Burnett, Crane, Foreman, McMillan, Ramey and Stover espoused a "pro-force" point of view. While "[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business," *State Farm*, 538 U.S. at 423, the harm actually caused to physicians is necessarily bound up with the prior poster pattern. To this extent the conduct that harmed physicians is similar enough to the harm caused by other conduct of ACLA to be factored into the reprehensibility analysis. Even so, not a great deal of weight can be put on ACLA's past behavior because that conduct did not harm these particular doctors. "Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis, . . ." or to create the possibility of multiple punitive damages awards for the same conduct. *Id*. Also, no one involved in the present action pulled the trigger in past actions, although a number were supportive in one way or another.

*Intentional malice or accident*. As we have explained, physicians were not harmed by accident. ACLA acted intentionally to intimidate them by making true threats of serious injury.

[6] In sum, while ACLA justifies its conduct as political speech that cannot be reprehensible, we have already held that FACE prohibits the specific conduct in which it chose to engage and that true threats of the sort ACLA made in order to intimidate physicians are not protected under the First

Amendment. As true threats of violence were made with the intent to intimidate, ACLA's conduct is on the high side of reprehensibility. We do not put it on the top rung because it did not involve actual violence with respect to these physicians. However, ACLA did what it did knowing that physicians would believe that what had happened to others who had been identified on posters would happen to them, that is, that they would be killed, and that this would frighten them into quitting their practice rather than risk suffering the same fate as Dr. Gunn, Dr. Patterson, and Dr. Britton who had been struck down in the wake of being identified on "WANTED"-type posters. Physicians in fact interpreted the posters as intended, and Crist did in fact quit. This is far more egregious than not disclosing that a new car has been repainted, as in *BMW*, and is much closer to treading on personal liberty, which we found seriously reprehensible in discrimination cases such as *Swinton*, *Zhang*, and *Bains*. Thus, we conclude that ACLA's intentional intimidation of physicians, aimed at forcing them to quit practicing out of fear for their lives, weighs heavily in favor of physicians; that none of the other factors is negative, even though not strongly positive; and that on balance, ACLA's conduct is sufficiently reprehensible to warrant the imposition of significant sanctions to punish and deter.

B

*Ratio*

It is not easy to figure the ratio in this case. Unlike the post-*BMW* cases we have surveyed where there is one plaintiff and one defendant, here there are multiple plaintiffs and multiple defendants. The jury awarded each plaintiff the same amount of compensatory damages from each defendant. However, the district court held (and the parties do not dispute) that the awards are joint and several.[5] By contrast, the jury awarded

---

[5]It is evident from the special verdict that the jury determined the amount of harm suffered by each plaintiff, then awarded that amount

each plaintiff punitive damages in a discrete amount from each defendant. It was instructed to consider the degree of reprehensibility and the relationship of any award to the actual harm inflicted. From the verdict it is obvious that the jury found different levels of reprehensibility, and fixed the amount of the punitive damages awarded to each plaintiff from each defendant based on its assessment of each defendant's reprehensibility relative to other defendants and to each plaintiff.

Not surprisingly, the parties differ in their approach to the comparison that should be made to determine the applicable ratio. ACLA argues that the total compensatory damages recoverable by each plaintiff should be compared with the total punitive damages awarded to that plaintiff for the same alleged course of conduct by all defendants. Its rationale is that this would reflect the physicians' theory of the case as one course of conduct undertaken by all fourteen defendants based on the same three communications. ACLA's approach yields a ratio of 366 to 1 for Crist; 901 to 1 for Hern; 886 to 1 for E. Newhall; 37,333 to 1 for J. Newhall; 467 to 1 for PPCW; and 73 to 1 for PFWHC.

The district court rejected this approach for good reason. It fails to allow for the possibility that the reprehensibility of individual defendants can — and as the jury found here, does — differ. Also, it runs counter to the court's task of determining whether any or all of the *defendants* had their due process

against each defendant. Physicians do not contend that they are each entitled to fourteen times this amount. From this, the district court deduced that the compensatory awards were joint and several. We have no quarrel with the district court's interpretation of the import of the verdicts, but we express no opinion whether joint and several liability is or should be the norm in all FACE cases. *Cf. United States v. Gregg*, 226 F.3d 253, 257-60 (3d Cir. 2000) (holding that Congress intended for FACE's compensatory *statutory* damages to be awarded on a *per violation* rather than a *per respondent* basis, thus making defendants jointly and severally liable).

rights violated. Finally, to compare the amount of compensatory damages awarded to one plaintiff with the total amount of punitive damages awarded to that plaintiff from all defendants shifts the focus away from a particular defendant's conduct to the defendants' conduct *en grosse. See, e.g., Bell*, 341 F.3d at 867 (directing that "[o]n remand, the trial court should evaluate the degree of reprehensibility of each of the defendant's misconduct individually, as opposed to *en grosse*").

Instead, the district court adopted physicians' approach and arrived at the ratios used for its *BMW* analysis by comparing the total joint and several liability of each defendant for compensatory damages ($526,336.14) with that defendant's liability for punitive damages. So calculated, by defendant, the ratios of punitive to compensatory damages are 31.8 to 1 for ACLA and ALM; 15.2 to 1 for Bray, Burnett, Crane, McMillan, Treshman, and Wysong; 9.5 to 1 for Dodds, Dreste, Foreman and Murch; and 6.6 to 1 for Ramey and Stover.[6] A chart summarizing the district court's analysis is attached as Appendix II. This approach has the merit of focusing the due process analysis on liability from the defendant's perspective, but it does not differentiate on the basis of harm inflicted upon a particular plaintiff by a particular defendant, as a correct approach should also do. For this reason, it tends to produce an artificially low, overall ratio.

[7] The district court considered, but declined to accept, a third approach that would compare each plaintiff's individual compensatory damages and punitive damages awards as to each defendant. A chart setting forth this analysis is attached as Appendix III. The court was troubled by the fact that this approach yields extreme variations in ratios, depending upon

[6]The compensatory award to each plaintiff is the denominator in the ratio for each defendant ($39,656 in Crist's case, for example). *See Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1024-25 (9th Cir. 1985) (basing denominator in ratio on the amount for which each defendant is jointly and severally liable).

the amount of the compensatory award. Thus, ratios with respect to Crist would range from a high of 56.7 to 1 for ACLA and ALM to a low of 12.6 to 1 for Ramey and Stover. However, extreme variation is not so much a reason for rejecting an approach to determine the ratio, as for rejecting awards that are grossly disproportionate. Rather, in a multi-plaintiff, multi-defendant action, an approach that compares each plaintiff's individual compensatory damages with the punitive damages awards against each defendant more accurately reflects the true relationship between the harm for which a particular defendant is responsible, and the punitive damages assessed against that defendant.

This approach is preferable to that urged by physicians and adopted by the district court for several reasons. Merging the physicians' damages against a particular defendant as the district court did, rather than considering them on a plaintiff-by-plaintiff, defendant-by-defendant basis, has the distorting effect of making some ratios appear closer to a constitutional level than they truly are, while making others appear further from it than they really are. This is illustrated by how the analysis works out with two plaintiffs, Crist and J. Newhall, and two defendants, Wysong and Stover:

| Defendant | Compensatory | Punitive | District Ct. Ratios | Alternative Ratios |
|---|---|---|---|---|
| Wysong | Crist: $39,656<br>Newhall: $375. | Crist: $1m<br>Newhall: $1m | 50: 1 | Crist: 25:1<br>Newhall: 2666.7: 1 |
| Stover | Crist: $39,656.<br>Newhall: $375. | Crist: $500k<br>Newhall: $500k | 25: 1 | Crist: 12.6: 1<br>Newhall: 1333.3: 1 |

Crist recovered higher compensatory damages ($39,656) than J. Newhall ($375). The jury awarded Crist $500,000 in punitive damages against Stover, and $1 million against Wysong; it awarded J. Newhall $500,000 in punitive damages against Stover, and $1 million against Wysong. Under the district court's approach, Crist's compensatory damages award was merged with J. Newhall's damages, and then the award of

punitive damages for each of them against each defendant was also merged. On this take, Wysong's ratio for both Crist and J. Newhall is 50:1; Stover's for both is 25:1. By contrast, on a plaintiff-by-plaintiff, defendant-by-defendant basis, Wysong's ratio for Crist is 25:1 and for J. Newhall, 2666.7:1; Stover's ratio for Crist is 12.6:1 and for J. Newhall, 1333.3:1. A punitive damages award for Crist in the amount of $500,000 against Stover bears a somewhat reasonable relationship to the actual harm caused ($40,000), but the award in favor of J. Newhall is nowhere near the "reasonable relationship" that *State Farm* and *BMW* require. Thus, under physicians' approach, the punitive damages awards upheld as constitutional based on the ratio of the overall compensatory damages to the overall punitive damages for which a defendant is liable implicate the due process rights of defendants when broken down to the specific award on a per plaintiff, per defendant basis.

In addition, arriving at the ratio on a plaintiff-by-plaintiff, defendant-by-defendant basis respects the jury's verdict. The jury awarded punitive damages to each plaintiff from each defendant; it did not award punitive damages against each defendant as one lump sum.

Finally, it makes sense to compare each plaintiff's individual compensatory damages and punitive damages awards as to each defendant because this approach simplifies the task of assessing constitutional reasonableness. If it appears that the envelope is pushed too far, the reviewing court can figure out who is to receive what amount of money from whom, and remit on a per plaintiff, per defendant basis.

[8] Accordingly, we accept the ratios (reflected in Appendix III) arrived at by comparing each plaintiff's individual compensatory damages and punitive damages awards as to each defendant. Having decided what the ratios are, the question is whether they pass constitutional muster. We think not.

[9] Although the Supreme Court has eschewed any specific formula, we discern from *BMW* and its progeny a rough framework for evaluating whether there is a reasonable relationship between the punitive damages award and the actual or likely harm associated with the wrongful conduct. In cases where there are significant economic damages and punitive damages are warranted but behavior is not particularly egregious, a ratio of up to 4 to 1 serves as a good proxy for the limits of constitutionality. *See, e.g., State Farm*, 538 U.S. at 425 (acts of bad faith and fraud warranted something closer to a 1 to 1 ratio). In cases with significant economic damages and more egregious behavior, a single-digit ratio greater than 4 to 1 might be constitutional. *See, e.g., Zhang*, 339 F.3d at 1043-44 (post-*State Farm* case upholding 7 to 1 ratio where the wrongful conduct involved significant racial discrimination); *Bains*, 405 F.3d at 776-77 (post-*State Farm* case indicating that ratio between 6 to 1 and 9 to 1 would be constitutional where underlying wrongful conduct was racial discrimination). And in cases where there are insignificant economic damages but the behavior was particularly egregious, the single-digit ratio may not be a good proxy for constitutionality. *See, e.g., Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003) (upholding a punitive damage award with a 37 to 1 ratio of punitive damages to compensatory damages as constitutional because "defendant's behavior was outrageous but the compensable harm" was nominal and difficult to quantify).

[10] With few exceptions, the ratios in this case are well in excess of single digits. Most of the compensatory awards are substantial. At the same time, not all of physicians' damage is quantifiable, and not all of it was compensated; emotional distress as well as security costs will no doubt continue despite the injunction. We agree with the district court that ACLA's conduct is particularly reprehensible. ACLA made no bones about its intent to intimidate those in the reproductive health services community by true threats of serious injury or death. In these circumstances, a substantial award of

punitive damages in relation to the actual harm caused will reasonably serve the interests of punishment and deterrence. Our constitutional sensibilities are not offended by a 9 to 1 ratio.

## C

### Sanctions for Comparable Conduct

[11] We need not go beyond FACE itself, as it provides for criminal fines, 18 U.S.C. § 248(b), and civil penalties in actions brought by the Attorney General, *id.* § 248(c)(2). A fine for a nonviolent physical obstruction may not be more than $10,000 for the first offense, or more than $25,000 for a subsequent offense. The court may assess a civil penalty against each respondent in a civil action by the Attorney General not to exceed $10,000 for a nonviolent physical obstruction and $15,000 for other first violations. These penalties indicate that Congress believed that substantial sanctions were appropriate to deter those who interfere with clinic operations. *See Gregg*, 226 F.3d at 259. FACE's provision for punitive damages is uncapped, so ACLA would have known that its exposure to penalties in a civil action for violating that Act could be significant.[7]

## D

### Remittitur

[12] Considering reprehensibility, which is high; the ratios, which in the main reflect punitive awards that are significantly disproportionate to the amount of actual or likely harm;

---

[7]Aggrieved parties who bring private actions for relief may elect to recover an award of statutory damages in the amount of $5,000 per violation in lieu of actual damages. 18 U.S.C. § 248(b). Statutory damages are meant to compensate victims when actual loss is hard to prove. Punitive damages are recoverable on this theory as well.

and comparable sanctions, which suggest a ballpark figure in dollar terms of $45,000 to $75,000 per defendant, we conclude that the award of punitive damages cannot stand. Having already afforded the district court an opportunity to review the awards in the first instance, we believe it is appropriate to remit rather than again to remand.

[13] This requires us to decide how to arrive at a sum for each defendant to pay each plaintiff that is consistent with constitutional principles. We know what harm the jury found that each plaintiff suffered. We also know the punitive liability that the jury assessed against each defendant in favor of each plaintiff. Accordingly, we shall remit to a sum for each plaintiff that is nine times that plaintiff's compensatory recovery, and we shall allocate that amount of punitive damages among defendants in the same proportion as the jury did in its verdicts.

The remittitur is as follows:

| PLAIN-TIFF | compensatory damages award per plaintiff | punitive damages cap[8] total jury punitive award to plaintiff | punitive damages award by jury per defendant[9] | remitted damages per defendant per plaintiff[10] |
|---|---|---|---|---|
| Crist | $39,656 | $356,904/ $14.5m | ACLA: $2.25m<br>ALM: $2.25m<br>Bray: $1m<br>Burnett: $1m<br>Crane: $1m<br>Dodds: $750k<br>Dreste: $750k<br>Foreman: $750k<br>McMillan: $1m<br>Murch: $750k<br>Ramey: $500k<br>Stover: $500k<br>Treshman: $1m<br>Wysong: $1m | ACLA: $55,381.50<br>ALM: $55,381.50<br>Bray: $24,614<br>Burnett: $24,614<br>Crane: $24,614<br>Dodds: $18,460.50<br>Dreste: $18,460.50<br>Foreman: $18,460.50<br>McMillan: $24,614<br>Murch: $18,460.50<br>Ramey: $12,307<br>Stover: $12,307<br>Treshman: $24,614<br>Wysong: $24,614 |

[8] This figure is the actual compensatory award times nine (rounded out), *i.e.,* the constitutional limit of punitive damages. For example, in Crist's case: Crist was awarded $39,656 in compensatory damages. Nine times that amount is $356,904.

[9] This figure is based on the jury's verdicts. For example, Crist was awarded $1,000,000 in punitive damages against Bray.

[10] This figure is the limit of what each defendant must pay to each plaintiff in punitive damages. It is derived by comparing the total amount of punitive damages awarded by the jury to each plaintiff to the amount that is constitutionally permissible. For example, in Crist's case: The jury awarded Crist punitive damages of $14,500,000; the Constitution supports an award of only $356,904; the award against Bray is $1,000,000; therefore the limit of what Bray must pay to Crist is $1,000,000 times the relationship that $356,904 bears to $14,500,000, or $24,614.

| | | | | |
|---|---|---|---|---|
| **Hern** | $14,429 | $129,861/ $13m | ACLA: $1.5m<br>ALM: $1.5m<br>Bray: $1m<br>Burnett: $1m<br>Crane: $1m<br>Dodds: $750k<br>Dreste: $750k<br>Foreman: $750k<br>McMillan: $1m<br>Murch: $750k<br>Ramey: $500k<br>Stover: $500k<br>Treshman: $1m<br>Wysong: $1m | ACLA: $14,983.50<br>ALM: $14,983.50<br>Bray: $9,989.00<br>Burnett: $9,989.00<br>Crane: $9,989.00<br>Dodds: $7,491.75<br>Dreste: $7,491.75<br>Foreman: $7,491.75<br>McMillan: $9,989.00<br>Murch: $7,491.75<br>Ramey: $4,994.00<br>Stover: $4,994.00<br>Treshman: $9,989.00<br>Wysong: $9,989.00 |
| **E. Newhall** | $15,797.98 | $142,181.82/ $14m | ACLA: $2m<br>ALM: $2m<br>Bray: $1m<br>Burnett: $1m<br>Crane: $1m<br>Dodds: $750k<br>Dreste: $750k<br>Foreman: $750k<br>McMillan: $1m<br>Murch: $750k<br>Ramey: $500k<br>Stover: $500k<br>Treshman: $1m<br>Wysong: $1m | ACLA: $20,312.00<br>ALM: $20,312.00<br>Bray: $10,156.00<br>Burnett: $10,156.00<br>Crane: $10,156.00<br>Dodds: $7,617.00<br>Dreste: $7,617.00<br>Foreman: $7,617.00<br>McMillan: $10,156.00<br>Murch: $7,617.00<br>Ramey: $5,078.00<br>Stover: $5,078.00<br>Treshman: $10,156.00<br>Wysong: $10,156.00 |
| **J. Newhall** | $375 | $3,375/ $14m | ACLA: $2m<br>ALM: $2m<br>Bray: $1m<br>Burnett: $1m<br>Crane: $1m<br>Dodds: $750k<br>Dreste: $750k<br>Foreman: $750k<br>McMillan: $1m<br>Murch: $750k<br>Ramey: $500k<br>Stover: $500k<br>Treshman: $1m<br>Wysong: $1m | ACLA: $482.00<br>ALM: $482.00<br>Bray: $241.00<br>Burnett: $241.00<br>Crane: $241.00<br>Dodds: $180.75<br>Dreste: $180.75<br>Foreman: $180.75<br>McMillan: $241.00<br>Murch: $180.75<br>Ramey: $120.50<br>Stover: $120.50<br>Treshman: $241.00<br>Wysong: $241.00 |

| | | | | |
|---|---|---|---|---|
| **PPCW** | $405,834.86 | $3,652,513.74/ $29.5m | ACLA: $6m<br>ALM: $6m<br>Bray: $2m<br>Burnett: $2m<br>Crane: $2m<br>Dodds: $1m<br>Dreste: $1m<br>Foreman: $1m<br>McMillan: $2m<br>Murch: $1m<br>Ramey: $750k<br>Stover: $750k<br>Treshman: $2m<br>Wysong: $2m | ACLA: $742,884.00<br>ALM: $742,884.00<br>Bray: $247,628.00<br>Burnett: $247,628.00<br>Crane: $247,628.00<br>Dodds: $123,814.00<br>Dreste: $123,814.00<br>Foreman: $123,814.00<br>McMillan: $247,628.00<br>Murch: $123,814.00<br>Ramey: $92,860.50<br>Stover: $92,860.50<br>Treshman: $247,628.00<br>Wysong: $247,628.00 |
| **PFWHC** | $50,243.30 | $452,189.70/ $23.5m | ACLA: $3m<br>ALM: $3m<br>Bray: $2m<br>Burnett: $2m<br>Crane: $2m<br>Dodds: $1m<br>Dreste: $1m<br>Foreman: $1m<br>McMillan: $2m<br>Murch: $1m<br>Ramey: $750k<br>Stover: $750k<br>Treshman: $2m<br>Wysong: $2m | ACLA: $57,726.00<br>ALM: $57,726.00<br>Bray: $38,484.00<br>Burnett: $38,484.00<br>Crane: $38,484.00<br>Dodds: $19,242.00<br>Dreste: $19,242.00<br>Foreman: $19,242.00<br>McMillan: $38,484.00<br>Murch: $19,242.00<br>Ramey: $14,431.50<br>Stover: $14,431.50<br>Treshman: $38,484.00<br>Wysong: $38,484.00 |

**[14]** We shall remand for the district court to order a new trial unless physicians accept a remittitur in accord with the fourth column in this table.

### III

ACLA raised seven other issues on remand to the district court, and on appeal: (1) whether the Supreme Court's decision in *Scheidler v. NOW*, 537 U.S. 393 (2003), which was

rendered after our en banc judgment, requires dismissal of all RICO claims and a new trial on FACE claims; (2) whether the Court's intervening decision in *Virginia v. Black*, 538 U.S. 343 (2003), mandates a retrial; (3) whether ACLA is entitled to a new trial because the en banc opinion adopted a new theory of liability; (4) whether the clinics lack standing because they were not named in the communications, were legally incapable of being threatened with bodily harm, and cannot recover speculative security expenses; (5) whether the district court erred in not dismissing the FACE conspiracy claim; (6) whether FACE is unconstitutional; and (7) whether the injunction must be vacated or modified. However, we agree with the district court that it could not go there, nor can we, because all these issues were finally settled in *PPCW V*.

In *PPCW V*, on rehearing en banc, we affirmed the district court's judgment in all respects but for the constitutionality of the punitive damages awards. At ACLA's request, we stayed the mandate so that it could file a petition for a writ of certiorari in the Supreme Court. It did, and the Court invited the Solicitor General to express the views of the United States. Having received the Solicitor General's submission, which concluded that none of ACLA's challenges to *PPCW V* merited review, the Supreme Court denied the petition. Our mandate issued.

[15] It has been established since the Supreme Court's decision in *In re Sanford Fork & Tool Co.*, 160 U.S. 247 (1895), that

> [w]hen a case has been once decided by this court on appeal, and remanded to the circuit court, whatever was before this court, and disposed of by its decree, is considered as finally settled. The circuit court is bound by the decree as the law of the case, and must carry it into execution according to the mandate. That court cannot vary it, or examine it for any other purpose than execution; or give any other or further

> relief; or review it, even for apparent error, upon any matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.

*Id.* at 255; *see also United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir. 2000); *Firth v. United States*, 554 F.2d 990, 994 (9th Cir. 1977) ("Our prior decision and mandate in this case, whether correct or in error, was based on a thorough review of all of the evidence and consideration of the same arguments pressed here . . . . The resulting mandate did not leave the matter open for reappraisal . . . .") (footnotes omitted); *Atlas Scraper & Eng'g Co. v. Pursche*, 357 F.2d 296, 297 (9th Cir. 1966) ("Nothing is before this court but what is subsequent to the mandate.") (internal quotation marks omitted). Indeed, as we have said, "[f]or a century and a half, our Supreme Court has hammered home the principle that, on a second appeal, the higher court is confined to a consideration of the proceedings that took place in the trial court after the mandate in the first case was handed down. Matters that were adjudicated on the first appeal are no longer open to re-examination." *Coleman Co. v. Holly Mfg. Co.*, 269 F.2d 660, 664 (9th Cir. 1959). Add another half-century, and the same is true.

None of the cases upon which ACLA relies is apposite. *Robinson v. Heilman*, 563 F.2d 1304, 1307 (9th Cir. 1977) (per curiam), involved supervening law handed down after a district court decision but before the court of appeals had made a decision. In *Portland Feminist Women's Health Center v. Advocates for Life, Inc.*, 62 F.3d 280, 282 (9th Cir. 1994), we deferred submission pending a decision by the Supreme Court. In *EEOC v. United Parcel Service, Inc.*, 306 F.3d 794, 796-97 (9th Cir. 2002), we remanded to the district court to consider an issue in light of a new Supreme Court decision. And in *Perez v. Simmons*, 884 F.2d 1136, 1137 (9th Cir. 1989), the Supreme Court remanded for us to consider a recently rendered decision.

[16] Our mandate in *PPCW V* was clear. We finally adjudicated all issues except for, and remanded only for consideration of, the constitutional implications of the punitive damages awards. Accordingly, ACLA's additional issues are not open for review.

## IV

We affirm the district court's disposition of issues other than the constitutional propriety of the punitive damages awards. As to punitive damages, the awards exceed constitutional limits; we therefore reverse the district court's judgment to this extent and vacate it. We reduce the awards to the amount of remitted damages per plaintiff, per defendant set forth in the table on pages 35-38. We remand so that the district court may order a new trial unless physicians accept the remittitur. Each party shall bear its own costs.

AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART, AND REMANDED.

## APPENDIX I

### *Damages Awarded by the Jury*

| Defendant | FACE Compensatory Damages | FACE Punitive Damages | RICO (treble) Damages |
|---|---|---|---|
| **ACLA** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $2.25m<br>*Hern*: $1.5m<br>*E. Newhall*: $2m<br>*J. Newhall*: $2m<br>*PPCW*: $6m<br>*PFWHC*: $3m | N/A |
| **ALM** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $2.25m<br>*Hern*: $1.5m<br>*E. Newhall*: $2m<br>*J. Newhall*: $2m<br>*PPCW*: $6m<br>*PFWHC*: $3m | *Crist*: $118,968.<br>*Hern*: $43,287.<br>*E. Newhall*: $47,393.94<br>*J. Newhall*: $1,125.<br>*PPCW*: $1,217,504.58<br>*PFWHC*: $150,729.90 |
| **Michael Bray** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m | N/A |
| **Andrew Burnett** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m | *Crist*: $118,968.<br>*Hern*: $43,287.<br>*E. Newhall*: $47,393.94<br>*J. Newhall*: $1,125.<br>*PPCW*: $1,217,504.58<br>*PFWHC*: $150,729.90 |
| **David Crane** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m | *Crist*: $118,968.<br>*Hern*: $43,287.<br>*E. Newhall*: $47,393.94<br>*J. Newhall*: $1,125.<br>*PPCW*: $1,217,504.58<br>*PFWHC*: $150,729.90 |

| | | | |
|---|---|---|---|
| **Michael Dodds** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $750k<br>*Hern*: $750k<br>*E. Newhall*: $750k<br>*J. Newhall*: $750k<br>*PPCW*: $1m<br>*PFWHC*: $1m | *Crist*: $89,226.<br>*Hern*: $32,466.<br>*E. Newhall*: $35,544.<br>*J. Newhall*: $843.<br>*PPCW*: $913,128.<br>*PFWHC*: $113,046. |
| **Timothy Dreste** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $750k<br>*Hern*: $750k<br>*E. Newhall*: $750k<br>*J. Newhall*: $750k<br>*PPCW*: $1m<br>*PFWHC*: $1m | *Crist*: $59,484.<br>*Hern*: $21,645.<br>*E. Newhall*: $23,697.<br>*J. Newhall*: $564.<br>*PPCW*: $608,751.<br>*PFWHC*: $75,363 |
| **Joseph Foreman** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $750k<br>*Hern*: $750k<br>*E. Newhall*: $750k<br>*J. Newhall*: $750k<br>*PPCW*: $1m<br>*PFWHC*: $1m | *Crist*: $29,742.<br>*Hern*: $10,821.<br>*E. Newhall*: $11,850.<br>*J. Newhall*: $282.<br>*PPCW*: $304,377.<br>*PFWHC*: $37,683. |
| **C. Roy McMillan** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m | *Crist*: $89,226.<br>*Hern*: $32.466.<br>*E. Newhall*: $35,544.<br>*J. Newhall*: $843.<br>*PPCW*: $913,128.<br>*PFWHC*: $113,046. |
| **Bruce Murch** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $750k<br>*Hern*: $750k<br>*E. Newhall*: $750k<br>*J. Newhall*: $750k<br>*PPCW*: $1m<br>*PFWHC*: $1m | *Crist*: $59,484.<br>*Hern*: $21,645.<br>*E. Newhall*: $23,697.<br>*J. Newhall*: $564.<br>*PPCW*: $608,751.<br>*PFWHC*: $75,363. |
| **Catherine Ramey** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $500k<br>*Hern*: $500k<br>*E. Newhall*: $500k<br>*J. Newhall*: $500k<br>*PPCW*: $750k<br>*PFWHC*: $750k | *Crist*: $59,484.<br>*Hern*: $21,645.<br>*E. Newhall*: $23,697.<br>*J. Newhall*: $564.<br>*PPCW*: $608,751.<br>*PFWHC*: $75,363. |

| | | | |
|---|---|---|---|
| **Dawn Stover** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $500k<br>*Hern*: $500k<br>*E. Newhall*: $500k<br>*J. Newhall*: $500k<br>*PPCW*: $750k<br>*PFWHC*: $750k | *Crist*: $29,742.<br>*Hern*: $10,821.<br>*E. Newhall*: $11,850.<br>*J. Newhall*: $282.<br>*PPCW*: $304,377.<br>*PFWHC*: $37,683. |
| **Donald Treshman** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m | N/A |
| **Charles Wysong** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m | *Crist*: $118,968.<br>*Hern*: $43,287.<br>*E. Newhall*: $47,393.94<br>*J. Newhall*: $1,125.<br>*PPCW*: $1,217,504.58<br>*PFWHC*: $150,729.90 |

# APPENDIX II

## *District Court's Ratio Calculation*

| Defendant | FACE Compensatory jointly and severally liable | FACE Punitive | RATIO (punitive to compensatory) |
|---|---|---|---|
| ACLA | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30<br><br>Total: $526,336.14 | *Crist*: $2.25m<br>*Hern*: $1.5m<br>*E. Newhall*: $2m<br>*J. Newhall*: $2m<br>*PPCW*: $6m<br>*PFWHC*: $3m<br><br>Total: $16.75 million | 31.8: 1 |
| ALM | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30<br><br>Total: $526,336.14 | *Crist*: $2.25m<br>*Hern*: $1.5m<br>*E. Newhall*: $2m<br>*J. Newhall*: $2m<br>*PPCW*: $6m<br>*PFWHC*: $3m<br><br>Total: $16.75 million | 31.8: 1 |
| Michael Bray | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30<br><br>Total: $526,336.14 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m<br><br>Total: $8 million | 15.2: 1 |
| Andrew Burnett | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30<br><br>Total: $526,336.14 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m<br><br>Total: $8 million | 15.2: 1 |

| Defendant | FACE Compensatory | FACE Punitive | RATIO |
|---|---|---|---|
| David Crane | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30<br><br>Total: $526,336.14 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m<br><br>Total: $8 million | 15.2: 1 |
| Michael Dodds | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30<br><br>Total: $526,336.14 | *Crist*: $750k<br>*Hern*: $750k<br>*E. Newhall*: $750k<br>*J. Newhall*: $750k<br>*PPCW*: $1m<br>*PFWHC*: $1m<br><br>Total: $5 million | 9.5: 1 |
| Timothy Dreste | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30<br><br>Total: $526,336.14 | *Crist*: $750k<br>*Hern*: $750k<br>*E. Newhall*: $750k<br>*J. Newhall*: $750k<br>*PPCW*: $1m<br>*PFWHC*: $1m<br><br>Total: $5 million | 9.5: 1 |
| Joseph Foreman | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30<br><br>Total: $526,336.14 | *Crist*: $750k<br>*Hern*: $750k<br>*E. Newhall*: $750k<br>*J. Newhall*: $750k<br>*PPCW*: $1m<br>*PFWHC*: $1m<br><br>Total: $5 million | 9.5: 1 |
| C. Roy McMillan | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30<br><br>Total: $526,336.14 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m<br><br>Total: $8 million | 15.2: 1 |

| | | | |
|---|---|---|---|
| **Bruce Murch** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $750k<br>*Hern*: $750k<br>*E. Newhall*: $750k<br>*J. Newhall*: $750k<br>*PPCW*: $1m<br>*PFWHC*: $1m | 9.5: 1 |
| | Total: $526,336.14 | Total: $5 million | |
| **Catherine Ramey** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $500k<br>*Hern*: $500k<br>*E. Newhall*: $500k<br>*J. Newhall*: $500k<br>*PPCW*: $750k<br>*PFWHC*: $750k | 6.6: 1 |
| | Total: $526,336.14 | Total: $3.5 million | |
| **Dawn Stover** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $500k<br>*Hern*: $500k<br>*E. Newhall*: $500k<br>*J. Newhall*: $500k<br>*PPCW*: $750k<br>*PFWHC*: $750k | 6.6: 1 |
| | Total: $526,336.14 | Total: $3.5 million | |
| **Donald Treshman** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m | 15.2: 1 |
| | Total: $526,336.14 | Total: $8 million | |
| **Charles Wysong** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m | 15.2: 1 |
| | Total: $526,336.14 | Total: $8 million | |

# APPENDIX III

## *Comparison per plaintiff, per defendant*

| Defendant | FACE<br>Compensatory<br>*jointly and severally<br>liable* | FACE Punitive | RATIO<br>(punitive to<br>compensatory) |
|---|---|---|---|
| **ACLA** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $2.25m<br>*Hern*: $1.5m<br>*E. Newhall*: $2m<br>*J. Newhall*: $2m<br>*PPCW*: $6m<br>*PFWHC*: $3m | *Crist*: 56.7: 1<br>*Hern*: 104: 1<br>*E. Newhall*: 126.6: 1<br>*J. Newhall*: 5,333.3: 1<br>*PPCW*: 14.8: 1<br>*PFWHC*: 59.7: 1 |
| **ALM** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $2.25m<br>*Hern*: $1.5m<br>*E. Newhall*: $2m<br>*J. Newhall*: $2m<br>*PPCW*: $6m<br>*PFWHC*: $3m | *Crist*: 56.7: 1<br>*Hern*: 104: 1<br>*E. Newhall*: 126.6: 1<br>*J. Newhall*: 5,333.3: 1<br>*PPCW*: 14.8: 1<br>*PFWHC*: 59.7: 1 |
| **Michael Bray** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m | *Crist*: 25.2: 1<br>*Hern*: 69.3: 1<br>*E. Newhall*: 63.3: 1<br>*J. Newhall*: 2,666.7: 1<br>*PPCW*: 4.9: 1<br>*PFWHC*: 39.8: 1 |
| **Andrew Burnett** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m | *Crist*: 25.2: 1<br>*Hern*: 69.3: 1<br>*E. Newhall*: 63.3: 1<br>*J. Newhall*: 2,666.7: 1<br>*PPCW*: 4.9: 1<br>*PFWHC*: 39.8: 1 |
| **David Crane** | *Crist*: $39,656.<br>*Hern*: $14,429.<br>*E. Newhall*: $15,797.98<br>*J. Newhall*: $375.<br>*PPCW*: $405,834.86<br>*PFWHC*: $50,243.30 | *Crist*: $1m<br>*Hern*: $1m<br>*E. Newhall*: $1m<br>*J. Newhall*: $1m<br>*PPCW*: $2m<br>*PFWHC*: $2m | *Crist*: 25.2: 1<br>*Hern*: 69.3: 1<br>*E. Newhall*: 63.3: 1<br>*J. Newhall*: 2,666.7: 1<br>*PPCW*: 4.9: 1<br>*PFWHC*: 39.8: 1 |

| | | | |
|---|---|---|---|
| **Michael Dodds** | Crist: $39,656.<br>Hern: $14,429.<br>E. Newhall: $15,797.98<br>J. Newhall: $375.<br>PPCW: $405,834.86<br>PFWHC: $50,243.30 | Crist: $750k<br>Hern: $750k<br>E. Newhall: $750k<br>J. Newhall: $750k<br>PPCW: $1m<br>PFWHC: $1m | Crist: 18.9: 1<br>Hern: 52: 1<br>E. Newhall: 47.5: 1<br>J. Newhall: 2000: 1<br>PPCW: 2.5: 1<br>PFWHC: 19.9: 1 |
| **Timothy Dreste** | Crist: $39,656.<br>Hern: $14,429.<br>E. Newhall: $15,797.98<br>J. Newhall: $375.<br>PPCW: $405,834.86<br>PFWHC: $50,243.30 | Crist: $750k<br>Hern: $750k<br>E. Newhall: $750k<br>J. Newhall: $750k<br>PPCW: $1m<br>PFWHC: $1m | Crist: 18.9: 1<br>Hern: 52: 1<br>E. Newhall: 47.5: 1<br>J. Newhall: 2000: 1<br>PPCW: 2.5: 1<br>PFWHC: 19.9: 1 |
| **Joseph Foreman** | Crist: $39,656.<br>Hern: $14,429.<br>E. Newhall: $15,797.98<br>J. Newhall: $375.<br>PPCW: $405,834.86<br>PFWHC: $50,243.30 | Crist: $750k<br>Hern: $750k<br>E. Newhall: $750k<br>J. Newhall: $750k<br>PPCW: $1m<br>PFWHC: $1m | Crist: 18.9: 1<br>Hern: 52: 1<br>E. Newhall: 47.5: 1<br>J. Newhall: 2000: 1<br>PPCW: 2.5: 1<br>PFWHC: 19.9: 1 |
| **C. Roy McMillan** | Crist: $39,656.<br>Hern: $14,429.<br>E. Newhall: $15,797.98<br>J. Newhall: $375.<br>PPCW: $405,834.86<br>PFWHC: $50,243.30 | Crist: $1m<br>Hern: $1m<br>E. Newhall: $1m<br>J. Newhall: $1m<br>PPCW: $2m<br>PFWHC: $2m | Crist: 25.2: 1<br>Hern: 69.3: 1<br>E. Newhall: 63.3: 1<br>J. Newhall: 2,666.7: 1<br>PPCW: 4.9: 1<br>PFWHC: 39.8: 1 |
| **Bruce Murch** | Crist: $39,656.<br>Hern: $14,429.<br>E. Newhall: $15,797.98<br>J. Newhall: $375.<br>PPCW: $405,834.86<br>PFWHC: $50,243.30 | Crist: $750k<br>Hern: $750k<br>E. Newhall: $750k<br>J. Newhall: $750k<br>PPCW: $1m<br>PFWHC: $1m | Crist: 18.9: 1<br>Hern: 52: 1<br>E. Newhall: 47.5: 1<br>J. Newhall: 2000: 1<br>PPCW: 2.5: 1<br>PFWHC: 19.9: 1 |
| **Catherine Ramey** | Crist: $39,656.<br>Hern: $14,429.<br>E. Newhall: $15,797.98<br>J. Newhall: $375.<br>PPCW: $405,834.86<br>PFWHC: $50,243.30 | Crist: $500k<br>Hern: $500k<br>E. Newhall: $500k<br>J. Newhall: $500k<br>PPCW: $750k<br>PFWHC: $750k | Crist: 12.6: 1<br>Hern: 34.6: 1<br>E. Newhall: 31.6: 1<br>J. Newhall: 1,333.3: 1<br>PPCW: 1.8: 1<br>PFWHC: 14.9: 1 |

| | | | |
|---|---|---|---|
| **Dawn Stover** | Crist: $39,656.<br>Hern: $14,429.<br>E. Newhall: $15,797.98<br>J. Newhall: $375.<br>PPCW: $405,834.86<br>PFWHC: $50,243.30 | Crist: $500k<br>Hern: $500k<br>E. Newhall: $500k<br>J. Newhall: $500k<br>PPCW: $750k<br>PFWHC: $750k | Crist: 12.6: 1<br>Hern: 34.6: 1<br>E. Newhall: 35: 1<br>J. Newhall: 1,333.3: 1<br>PPCW: 1.8: 1<br>PFWHC: 14.9: 1 |
| **Donald Treshman** | Crist: $39,656.<br>Hern: $14,429.<br>E. Newhall: $15,797.98<br>J. Newhall: $375.<br>PPCW: $405,834.86<br>PFWHC: $50,243.30 | Crist: $1m<br>Hern: $1m<br>E. Newhall: $1m<br>J. Newhall: $1m<br>PPCW: $2m<br>PFWHC: $2m | Crist: 25.2: 1<br>Hern: 69.3: 1<br>E. Newhall: 63.3: 1<br>J. Newhall: 2,666.7: 1<br>PPCW: 4.9: 1<br>PFWHC: 39.8: 1 |
| **Charles Wysong** | Crist: $39,656.<br>Hern: $14,429.<br>E. Newhall: $15,797.98<br>J. Newhall: $375.<br>PPCW: $405,834.86<br>PFWHC: $50,243.30 | Crist: $1m<br>Hern: $1m<br>E. Newhall: $1m<br>J. Newhall: $1m<br>PPCW: $2m<br>PFWHC: $2m | Crist: 25.2: 1<br>Hern: 69.3: 1<br>E. Newhall: 63.3: 1<br>J. Newhall: 2,666.7: 1<br>PPCW: 4.9: 1<br>PFWHC: 39.8: 1 |

INTERNAL USE ONLY: Proceedings include all events.
04-35214 Planned Parenthood, et al v. American Coalition, et al

PLANNED PARENTHOOD OF THE
COLUMBIA/WILLAMETTE INC.
    Plaintiff - Appellee

Carol J. Bernick
(503) 241-2300
[COR LD NTC ret]
DAVIS, WRIGHT, TREMAINE
1300 SW 5th Avenue
2300 1st Interstate Tower
Portland, OR 97201

Maria T. Vullo, Esq.
FAX 212/373-2212
212/373-3000
[COR LD NTC ret]
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Roger K. Evans, Esq.
Suite 12
[COR LD NTC ret]
PLANNED PARENTHOOD FEDERATION
OF AMERICA
434 West 33rd St.
New York, NY 10001

PORTLAND FEMINIST WOMEN'S
HEALTH CENTER
    Plaintiff - Appellee

Carol J. Bernick
(See above)
[COR LD NTC ret]

Maria T. Vullo, Esq.
(See above)
[COR LD NTC ret]

Roger K. Evans, Esq.
(See above)
[COR LD NTC ret]

ROBERT CRIST, M.D.
    Plaintiff - Appellee

Carol J. Bernick
(See above)
[COR LD NTC ret]

Maria T. Vullo, Esq.
(See above)
[COR LD NTC ret]

Roger K. Evans, Esq.
(See above)
[COR LD NTC ret]

WARREN M. HERN, M.D.
    Plaintiff - Appellee

Carol J. Bernick
(See above)
[COR LD NTC ret]

Maria T. Vullo, Esq.

INTERNAL USE ONLY: Proceedings include all events.
04-35214 Planned Parenthood, et al v. American Coalition, et al

                                    (See above)
                                    [COR LD NTC ret]

                                    Roger K. Evans, Esq.
                                    (See above)
                                    [COR LD NTC ret]

ELIZABETH NEWHALL, M.D.             Carol J. Bernick
      Plaintiff - Appellee          (See above)
                                    [COR LD NTC ret]

                                    Maria T. Vullo, Esq.
                                    (See above)
                                    [COR LD NTC ret]

                                    Roger K. Evans, Esq.
                                    (See above)
                                    [COR LD NTC ret]

JAMES NEWHALL, M.D.                 Carol J. Bernick
      Plaintiff - Appellee          (See above)
                                    [COR LD NTC ret]

                                    Maria T. Vullo, Esq.
                                    (See above)
                                    [COR LD NTC ret]

                                    Roger K. Evans, Esq.
                                    (See above)
                                    [COR LD NTC ret]


    v.


AMERICAN COALITION OF LIFE          Christopher A. Ferrara, Esq.
ACTIVISTS                           FAX 973/244-9897
      Defendant - Appellant         973/244-9895
                                    Suite 7
                                    [COR LD NTC]
                                    Denis V. Brenan, Esq.
                                    FAX 973/244-897
                                    973/244-9895
                                    Suite 7
                                    [COR ret]
                                    AMERICAN CATHOLIC LAWYERS ASSN.,
                                    INC.
                                    P.O. Box 10092
                                    420 Route 46 East
                                    Fairfield, NJ 07004

                                    Edward L. White, III, Esq.
                                    FAX 734/930-7160
                                    734/827-2001
                                    [COR LD NTC]

Docket as of August 5, 2005 11:03 pm          Page 3    NON-PUBLIC